**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| GREGORY BRODSKY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17-cv-05222 |
| | ) | |
| v. | ) | Hon. Amy J. St. Eve |
| | ) | |
| DEBORAH BLAKE, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

AMY J. ST. EVE, District Court Judge:

Defendant Deborah Blake filed a motion to dismiss Plaintiff Gregory Brodsky's Complaint (R. 1), arguing that the Court should dismiss each count under Rule 12(b)(6), or alternatively, that the Court should stay this case pending resolution of a state-court proceeding in the Circuit Court of Cook County, Illinois under *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976).  (R. at 19.)

For the following reasons, the Court grants the motion to dismiss in part, denies it in part, and stays this action pending resolution of the state-court proceeding.

## BACKGROUND

This case involves a dispute between a co-owner of a car dealership, on the one hand, and the fellow co-owner and his wife, on the other.  The three-year-old row has now spilled into both state and federal courtrooms.

## I.    The Complaint

According to the Complaint, before 2013, Anthony Blake (the husband of Defendant Deborah Blake) owned 100% of two Illinois LLCs—T. Blake International Automobiles, LLC

("Auto Company") and T. Blake International Real Estate, LLC ("Real Estate Company) (collectively, the "Companies"). The Auto Company operates as a Kia car dealership under agreement with Kia Motors, Inc. The Real Estate Company owns the land on which the dealership sits. (R. 1 ¶¶ 1–4.)

In November 2009, Gregory Brodsky approached Mr. Blake about purchasing the Auto Company. They agreed that Mr. Brodsky would purchase 100% of the Auto Company, but before so doing, Mr. Brodsky would enjoy an "Evaluation Period." During that period, agreed to last two months, Mr. Brodsky would serve as the dealership's general manager ("GM"), and receive a $1,000-per-week salary plus half of the Auto Company's remaining profits. At the end of those two months, however, Mr. Blake and Mr. Brodsky came to new terms—Mr. Brodsky would continue as GM, and purchase 50% of each of the Companies, rather than 100% of the Auto Company. As GM, Mr. Brodsky "substantially increased the profitability of the Auto Company." (*Id.* ¶¶ 5–13.)

Mr. Brodsky and Mr. Blake revised their understanding again a couple years later, in 2012. Under their revised terms, Mr. Brodsky would purchase 100% of both Companies in "two tranches." In the first tranche, Mr. Brodsky would pay half of the "Purchase Price"—essentially the gross book value of the Auto Company's assets—and half of the capital required per the dealership agreement with Kia. In the second tranche, Mr. Brodsky would pay the remaining half of the Purchase Price and secure releases of Mr. Blake's guaranties for any of the Companies' debts or obligations in exchange for Mr. Blake's remaining 50% ownership in both Companies. The Complaint calls this the "Modified Agreement." (*Id.* ¶ 14.)

The Complaint alleges that, as a part of the Modified Agreement, "it was understood and agreed" that Mr. Brodsky would stay on as GM at his current salary. As another part of the

Modified Agreement, the parties would "regularly calculate the profits of the companies." (*Id.* ¶¶ 15–17.)

The parties executed—or to use the Complaint's word, "memorialize[d]"—the first tranche via a written Purchase Agreement, signed and dated January 1, 2013. Under that agreement, Mr. Brodsky paid about $97,000, a little more than half of the Purchase Price for the Auto Company. That agreement also states that Mr. Brodsky and Mr. Blake would each contribute half of the sum required to meet a capital requirement of $903,000, and the Complaint alleges that Mr. Brodsky paid $400,000 toward his share. The Purchase Agreement makes no mention of the second tranche—that is, the part of the Modified Agreement allowing for Mr. Brodsky's purchase of the Companies outright. Much to the contrary, it contains an integration clause. That clause, titled "<u>Entire Agreement</u>," reads:

> This Agreement sets forth and constitutes the entire agreement and understanding and all of the representations and warranties of the parties to this Agreement or any one or more of them in respect of the subject matter contained in this Agreement. This Agreement supersedes any and all prior agreements, undertakings, negotiations, correspondence, promises, covenants, arrangements, communications, representations and warranties, whether oral or written (collectively, the "Prior Communications") of any party to this Agreement in respect of the subject matter contained in this Agreement, and no party to this Agreement may rely or shall be deemed to have relied upon any Prior Communications.

(*Id.*, Ex. A.)

Kia had to approve "the admission of [Mr. Brodsky] as an equity owner of the Auto Company." It did so in May 2013, via an Ownership Control Agreement, which vested Mr. Blake with control of the dealership. (*Id.*, Ex. C.)

The Complaint then alleges that, around June 2014, doctors diagnosed Mr. Blake with a brain lesion, and he later suffered "one or more strokes." It was then that Mr. Brodsky first met Mrs. Blake. She reached out to Mr. Brodsky and told him about her husband's medical trouble

and his supposed, recently revealed infidelities.  She further informed him that Mr. Blake would be "stepping down" from the dealership, that she would be Mr. Brodsky's "new partner," and that she would be with Mr. Blake "every day" making "all the decisions."  (*Id.* ¶¶ 36–40.)  Mrs. Blake also forced Mr. Blake to give up his "burner" phone, and prohibited him from using a cellphone unmonitored, traveling alone, or handling the dealership's cash.  From that point on, Mr. Brodsky rarely interacted alone with Mr. Blake, who had become a "mouthpiece" for Mrs. Blake.  (*Id.* ¶ 47.)

With Mrs. Blake in the picture, Mr. Brodsky attempted to complete tranche two of the Modified Agreement.  In response, Mrs. Blake started to force him out of the Companies so that she and the Blakes' then-teenage son could "take over."  (*Id.* ¶¶ 54–55.)  She, for example, began regularly appearing at the dealership and conducting business with employees without Mr. Blake's knowledge.  She would also boss her husband around when he was at the dealership, and she hired her son to work at the dealership without the approval of Mr. Brodsky, the GM.  (*Id.* ¶ 56.)

As Mr. Brodsky "attempted to complete" the second tranche, Mrs. Blake hired accountants, purportedly, to crunch the numbers necessary to complete the transaction.  (*Id.* ¶ 58.)  In reality, however, Mrs. Blake hired the accountants to perform a "forensic audit" on the dealership's books.  Unhappy with the results of the first accountant, she hired another one, Carl S. Woodward.  Then, in November 2015, Mrs. Blake notified Mr. Brodsky that Mr. Woodward would report his findings at an upcoming meeting.  At that meeting, with Mr. and Mrs. Blake present, Mr. Woodward informed Mr. Brodsky that "his services were no longer needed," effectively terminating him.  (*Id.* ¶¶ 59–66.)

According to Mr. Brodsky, Mrs. Blake and Mr. Woodward "schemed" to manufacture "bogus" entries to justify not paying Mr. Brodsky. (*Id.* ¶¶ 83–88.) Since his termination, Mr. Brodsky has not received salary payments or profit distributions. In an effort to resolve the dispute, Mr. Brodsky made shotgun offers—he would buy Mr. Blake out, or Mr. Blake could buy him out—but those "were rejected." (*Id.* ¶ 70–71.)

Based on this history, Mr. Brodsky brings four causes of action against Mrs. Blake. Count I claims tortious interference with contract, namely, the Modified Agreement. Count II claims tortious interference with fiduciary duties. Count III claims tortious interference with business relationships and expectancy regarding the Modified Agreement, ownership of the Companies, and continued employment as GM. Finally, Count IV claims unauthorized prosecution in the name of another.[1]

## II.    The State Lawsuit

Count IV stems from a lawsuit filed in February 2016 on behalf of the Auto Company against Mr. Brodsky in the Circuit Court of Cook County (the "State Lawsuit"). Unsurprisingly, the complaint in the State Lawsuit tells a different story than Mr. Brodsky's here. That complaint was verified by Mr. Blake ("purportedly," according to Mr. Brodsky), and claims that Mr. Brodsky failed to execute day-to-day responsibilities and disregarded managerial, bookkeeping, and accounting functions. It brings claims for breach of contract, breach of fiduciary duty, conversion, and unjust enrichment against Mr. Brodsky.

In response, on March 29, 2016, Mr. Brodsky filed a Verified Counterclaim and Third-Party Claim for Declaratory Judgment and Other Relief (Mr. Brodsky's "State Complaint") on his own behalf and on behalf of the Companies, naming Mr. Blake—but not

---

[1] The Complaint alleges diversity jurisdiction, as Mr. Brodsky is a citizen of Illinois, Mrs. Blake is a citizen of Indiana, and the amount in controversy exceeds $75,000. (R. 1 ¶¶ 2–5.)

Mrs. Blake—as a third-party defendant and the Companies as counterdefendants. (R. 19-2.) The State Complaint, like the Complaint in this action, alleges that Mr. Brodsky and Mr. Blake had ongoing discussions about Mr. Brodsky's potential purchase of the Companies since 2009. Unlike the Complaint in this case, however, the State Complaint does not describe a two-tranche "Modified Agreement." Rather, it speaks of a "50% proposal," consummated by the same Purchase Agreement discussed above. Then, "[i]n or about the summer of 2014," after the onset of Mr. Blake's medical problems, the two "agreed that Greg Brodsky would purchase Anthony Blake's remaining 50% interest in the Company." Mr. Brodsky and Mr. Blake agreed to this again in April 2015, three years after the Complaint in this case alleges that they formed the Modified Agreement.

Other than that conspicuous difference, the Complaint here and the State Complaint involve similar facts. According to the State Complaint, Mrs. Blake became "actively involved" in the Companies' operations after her husband's diagnoses, leading to "disagreements" between her and Mr. Brodsky. The State Complaint again, like the Complaint here, further alleges the Blakes wrongfully terminated Mr. Brodsky and refused to be transparent about accounting practices and audits. Based on those allegations, the State Complaint claims breach of contract, breach of fiduciary duty, fraud, conversion, and unjust enrichment against Mr. Blake. It also asks for declarations that Mr. Blake "has acted improperly and in breach of his duties to the Companies," and that Mr. Brodsky "shall be restored as a Manager of the Companies to make day to day decisions as he previously did prior to his wrongful termination."

## LEGAL STANDARD

"A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be

granted." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014); *see also Hill v. Serv. Emp. Int'l Union*, 850 F.3d 861, 863 (7th Cir. 2017). Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Pursuant to the federal pleading standards, a plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Stated another way, a complaint must present "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Catinella v. Cnty. of Cook, Illinois*, 881 F.3d 514, 517 (7th Cir. 2018). When determining the sufficiency of a complaint, courts must "accept all well-pleaded facts as true and draw reasonable inferences in the plaintiffs' favor." *Roberts v. City of Chicago*, 817 F.3d 561, 564 (7th Cir. 2016).

## ANALYSIS

The Complaint brings four claims under Illinois law. *See also Auto-Owners Ins. Co., v. Webslov Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009) ("Courts do not worry about conflicts of laws unless the parties disagree on which state's law applies."). Mrs. Blake challenges the sufficiency of each claim, and then requests, alternatively, a stay under the *Colorado River* doctrine. The Court addresses those arguments in turn.

## I.      Count I Does Not State a Claim for Tortious Interference With Contract

Count I claims tortious interference with contract, specifically, the "Modified Agreement." (R. 1 ¶ 105; *see also id.* ¶¶ 102–109.) Under Illinois law, stating a claim for tortious interference with contract requires: "(1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a

subsequent breach by the other, caused by the defendant's wrongful conduct; and

(5) damages." *Healy v. Metro. Pier & Exposition Auth.*, 804 F.3d 836, 842 (7th Cir. 2015)

(quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 676 (Ill.

1989)); *see also MillerCoors LLC v. HCL Techs. Ltd.*, No. 17 C 1955, 2017 WL 4390369, at *2

(N.D. Ill. Oct. 3, 2017). Mrs. Blake argues that Count I falls at the first hurdle, the existence of

an enforceable contract. She contends, among other things, that there is no plausibly enforceable

Modified Agreement because the subsequent Purchase Agreement contained an integration

clause.

The Court agrees with Mrs. Blake—the Complaint does not plausibly allege an

enforceable Modified Agreement.[2] Where, as here, a contract is unambiguous, an agreement's

enforceability is a question of law that may be decided at the motion-to-dismiss stage. *See*

*Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir. 1998); *see also Forest Glen*

*Community Homeowners Ass'n v. Bishof*, 746 N.E.2d 1285, 1289 (Ill. App. Ct. 2001); *Am. Nat.*

*Bank & Tr. Co. of Chicago ex rel. Emerald Investments LP v. AXA Client Sols., LLC*, No. 00 C

6786, 2001 WL 743399, at *9 (N.D. Ill. June 29, 2001).

The Complaint alleges that Mr. Blake and Mr. Brodsky formed the Modified Agreement

sometime in 2012 when they agreed to, among other things, Mr. Brodsky purchasing 100% of

the Companies in "two tranches." (R. 1 ¶¶ 14–17.) The Complaint then alleges that the

Purchase Agreement signed in 2013 "memorialize[d] the First Tranche" and effectuated Mr.

Brodsky's 50% purchase of the Auto Company. (*Id.* ¶ 18; Ex. A.) That Purchase Agreement,

however, is attached the Complaint. *See* Fed. R. Civ. P. 10(c); *see also Int'l Mktg., Ltd. v.*

---

[2] Because the Court dismisses Count I on the basis of the integration clause, it will not consider Mrs.
Blake's alternative arguments relating to the inconsistent State Lawsuit admissions and the inadequacy of
the material terms alleged.

*Archer-Daniels-Midland Co., Inc.*, 192 F.3d 724, 729 (7th Cir. 1999) ("Documents attached to the complaint are incorporated into it and become part of the pleading itself."). It contains an integration clause, stating that it "sets forth and constitutes the entire agreement and understanding and all of the representations and warranties of the parties," and further, that it "supersedes any and all prior agreements . . . promises, covenants, [and] arrangements . . . whether written or oral." (R. 1, Ex. A.) That clause is not at all ambiguous; the Purchase Agreement's four corners are, as the clause's title suggests, the "<u>Entire Agreement</u>" as of 2013. (*Id.* (emphasis in original).)

In these circumstances, Illinois law is clear: "When a contract is fully integrated, the parol-evidence rule bars evidence of prior or contemporaneous agreements within the scope of the written contract." *W. Bend Mut. Ins. Co. v. Procaccio Painting & Drywall Co.*, 794 F.3d 666, 673 (7th Cir. 2015); *see also State Farm Mut. Auto. Ins. Co. v. Rodriguez*, 987 N.E.2d 896, 905 (Ill. App. Ct. 2013). Accordingly, the Court "is unable, by virtue of the integration clause, to recognize the asserted oral agreement"—that is, the Modified Agreement and its second tranche—and must conclude that Mr. Brodsky has "failed to state a claim" on Count I. *Murphy v. Curran Contracting Co.*, 648 F. Supp. 986, 987–88 (N.D. Ill. 1986); *see also McVickers McCook, LLC v. Wal-Mart Stores, Inc.*, No. 09 C 7523, 2010 WL 3283044, at *6 (N.D. Ill. Aug. 12, 2010) (noting that the court cannot "disregard the plain language of the integration clause" in dismissing claim); *Local 458, Graphic Commc'ns Int'l Union, AFL-CIO v. Excello Press, Inc.*, No. 86 C 1562, 1988 WL 1427, at *2 (N.D. Ill. Jan. 4, 1988) ("this court is bound to treat the Amendment as a completely integrated agreement" in light of integration clause); *N. Broadway Motors, Inc. v. Fiat Motors of N. Am., Inc.*, 622 F. Supp. 466, 468 (N.D. Ill. 1984) ("In light of the integration clause contained in ¶ 61(c) of the agreement, we cannot hold defendant

responsible for breaching undertakings that are not made expressly in the agreement."); *accord Procaccio Painting*, 794 F.3d at 675; *Anderson v. Country Life Ins. Co.*, No. 17 C 4270, 2018 WL 453737, at *3 (N.D. Ill. Jan. 16, 2018); *Narayan Rao v. Abbott Labs.*, No. 12 C 8014, 2013 WL 1768697, at *7 (N.D. Ill. Apr. 24, 2013).

Mr. Brodsky attempts to neutralize the integration clause by arguing that the contract is ambiguous and "subject to other agreements," and that the clause cannot apply to his tort claim. Neither attempt succeeds. In making his ambiguity argument, Mr. Brodsky cites the Purchase Agreement's requirement that Kia Motors approve the transaction and then matter-of-factly concludes that such a requirement renders the Purchase Agreement "facially ambiguous." (R. 25 at 8.) The Court sees nothing ambiguous about that requirement—and apparently neither did the parties, as they soon after secured Kia's approval via the Ownership Control Agreement. Mr. Brodsky also fails to support his related point, that the "presence of other documents" like the Ownership Control Agreement nullifies the integration clause, with logic or law. *See Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th Cir. 2016) ("Perfunctory and undeveloped legal arguments are waived, as are arguments unsupported by legal authority.").

As to his other argument, Mr. Brodsky is correct that courts have held that Illinois law does not enforce the parol-evidence rule in cases involving fraud claims. *See W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 968 (2004); *Vigortone AG Prod., Inc. v. PM AG Prod., Inc.*, 316 F.3d 641, 649 (7th Cir. 2002). But he does not cite a case, and the Court could not find a case, extending that principle to a claim for tortious interference with contract. That is unsurprising. In a fraud case, including ones for fraudulent inducement of or misrepresentation in a contract, a claimant need not plead or later show a valid and enforceable agreement. *See, e.g.*, *W.W. Vincent*, 814 N.E.2d at 969. In a contractual tortious-interference

case, on the other hand, "[t]he inability to establish the existence of a valid and enforceable contract is obviously fatal." *A-Abart Elec. Supply, Inc. v. Emerson Elec. Co.*, 956 F.2d 1399, 1404 (7th Cir. 1992); *Fid. Nat. Title Ins. Co. of New York v. Westhaven Properties P'ship*, 898 N.E.2d 1051, 1069 (Ill. App. Ct. 2007) ("In light of our holding that there was no valid assignment of the partnership interests between Fidelity and Old Intercounty, Fidelity's claim for tortious interference with contract cannot stand.").  To be sure, *Vigortone* does note that "the parol evidence rule is not a doctrine of tort law," 316 F.3d at 644, and *W.W. Vincent* states that the rule does not apply to claims "sounding in tort," 814 N.E.2d at 968.  Again, however, those cases involve only fraud claims (a kind of tort), and they provide no basis for the Court to depart from clear Illinois law requiring tortious-interference claims be premised on a "*valid and enforceable* contract." *See, e.g.*, *Prodromos v. Howard Sav. Bank*, 692 N.E.2d 707, 712 (Ill. App. Ct. 1998) (emphasis added) (affirming dismissal of tortious-interference claim "because such a cause of action requires the existence of a valid and enforceable contract, which we have found did not exist in this case"); *see also, e.g.*, *Liu v. Nw. Univ.*, 78 F. Supp. 3d 839, 852 (N.D. Ill. 2015); *Haynes v. Dart*, No. CIV. A. 08 C 4834, 2009 WL 590684, at *7 (N.D. Ill. Mar. 6, 2009); *Emery v. Ne. Illinois Reg'l Commuter R.R. Corp.*, No. 02 C 9303, 2003 WL 22176077, at *8 (N.D. Ill. Sept. 18, 2003).

Finally, Mr. Brodsky argues, even if the integration clause is considered, it "in no way impacts upon [his] claims regarding a contract for the purchase of the Real Estate Company" because "Plaintiff's purchase of 100% of the Real Estate Company is separate and distinct from the purchase of the Auto Company." (R. 25 at 9–10.)  That argument, as Mrs. Blake rightly points out, is not only unsupported by the Complaint's allegations, it is flatly inconsistent with them.  In the Complaint, Mr. Brodsky defined the Modified Agreement as an agreement to

"acquire 100% of *both* the Auto Company and the Real Estate Company . . . in two tranches."
(R. 1 ¶ 14 (emphasis added).)  The first tranche—allegedly "memorialize[d]" by the Purchase
Agreement—involved receipt of "50% interest in *both Companies*."  (*Id.* (emphasis added).)  As
such, the Complaint does not allege multiple, severable "agreements" relating to the sale of the
Companies; it alleges a single "Modified Agreement," of which the Purchase Agreement was the
first step.  Stated differently, there was no isolatable part of the Modified Agreement alleged that
is somehow "so far a separate and distinct matter as to be capable of existence as an independent
legal act," as Mr. Brodsky submits.  (R. 25 at 9 (quoting *Midwest Builder Distr., Inc. v. Lord and
Essex, Inc.*, 891 N.E.2d 1, 19 (Ill. App. Ct. 2007)).  The Modified Agreement's enforceability is
therefore implausible.

To be clear, the date of the Modified Agreement—2012—dooms Mr. Brodsky's claim.
According to the Complaint, the parties effectuated the Purchase Agreement and its integration
clause after that date—in 2013—and in so doing, "effectively extinguished" whatever
supplemental terms may have previously existed in the Modified Agreement.  *Cascades
Computer Innovation, LLC v. Motorola Mobility Holdings, Inc.*, No. 11 C 4574, 2013 WL
3366276, at *6 (N.D. Ill. July 5, 2013) (holding, at motion-to-dismiss stage, "if there actually
was a May 19, 2004 agreement . . . it was effectively extinguished by the August 6, 2004
agreement, given that agreement's integration clause"); *see also Int'l Mktg.*, 192 F.3d at 730
(affirming dismissal under Rule 12(b)(6), stating "an effective integration clause" means that a
claimant may not rely on "any prior or contemporaneous oral agreements"); *compare with, e.g.*,
*U.S. Neurosurgical, Inc. v. City of Chi.*, 572 F.3d 325, 332 (7th Cir. 2009) ("[U]nder Illinois law,
the terms of a written contract can be modified by a *subsequent* oral agreement notwithstanding
contractual language to the contrary") (emphasis added).  The Court therefore dismisses Count I

with prejudice.  *See Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011) (explaining that a plaintiff may plead himself out of court by alleging facts that defeat his claim); *Tamayo v. Blagojevich*, 526 F.3d 1074, 1086 (7th Cir. 2008) (same).

## II.     Count II Adequately States a Claim for Tortious Interference with Fiduciary Duty

Count II claims that Mrs. Blake tortiously interfered with the fiduciary duties Mr. Blake owed to Mr. Brodsky.  Illinois law instructs that a party states a claim for tortious inducement of a breach of fiduciary duty if he adequately alleges that the defendant: "(1) colluded with a fiduciary in committing a breach; (2) knowingly participated in or induced the breach of duty; and (3) knowingly accepted the benefits resulting from that breach."  *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 508 (7th Cir. 2007); *PharMerica Chicago, Inc. v. Meisels*, 772 F. Supp. 2d 938, 963 (N.D. Ill. 2011).[3]  Mrs. Blake does not contest that Mr. Blake owed Mr. Brodsky fiduciary duties.  Instead, she argues that Mr. Brodsky has failed to allege how Mr. Blake breached those duties.

The Court disagrees.  The Complaint alleges that after doctors diagnosed Mr. Blake with a brain lesion and after he suffered at least one subsequent stroke, Mrs. Blake "implemented numerous restrictions" on her husband, including prohibiting him from handling business finances, and assumed responsibilities for running the Auto Company.  By summer 2014, according to the Complaint, Mrs. Blake had insisted with her husband that she "tak[e] over" his "duties" at the Auto Company, and "be[ ] actively involved in the operations of the company."

---

[3] Mrs. Blake cites a 1942 case and suggests that this cause of action, or at least its first prong, should be pleaded with "particularity."  (R. 19 at 12 (citing *Aaron v. Dausch*, 40 N.E.2d 805 (Ill. App. Ct. 1942).)  Whatever the effect of the quoted passage, that case does not hold that any part of a claim for tortious interference with fiduciary duty should be subject to a "particularity" pleading requirement akin to that required under Rule 9(b).  Moreover, even if it did, federal law determines the applicable pleading standard here, and Rule 9(b) only applies to claims sounding in fraud, which the Complaint does not allege.  *See, e.g.*, *PharMerica*, 772 F. Supp. 2d at 959.

The Complaint then alleges that Mrs. Blake enmeshed herself at the Auto Company, including hiring Mr. Woodward, who—at a meeting with Mr. Blake—terminated Mr. Brodsky without cause. Mrs. Blake and Mr. Woodward also implemented accounting practices that diminished Mr. Brodsky's performance and kept him from receiving distributions, according to the Complaint. In addition, the Complaint alleges that Mrs. Blake took these steps to keep her family's ownership of the Auto Company. These allegations suffice at this stage, as the Court can infer Mr. Blake allegedly breached his duties by being involved in Mr. Brodsky's firing and by relinquishing oversight of the Companies. *Accord Deloitte & Touche LLP v. Carlson*, No. 11 C 327, 2011 WL 2923865, at *7 (N.D. Ill. July 18, 2011); *Sequel Capital, LLC v. Pearson*, No. 07-CV-2642, 2010 WL 4008161, at *8–9 (N.D. Ill. Oct. 13, 2010).

Mrs. Blake also argues that the Complaint fails to allege the requisite "collusion" because it alleges that Mr. Blake suffered mental infirmities. To reach that conclusion, however, the Court would have to draw a critical inference—that Mr. Blake's as-alleged medical problems rose to the level of sustained legal incapacity—in her favor, not Mr. Brodsky's, which the Court cannot do. *Roberts*, 817 F.3d at 564. The Court therefore denies the motion to dismiss with respect to Count II.

### III.    Count III Adequately States a Claim for Tortious Interference With Business Relationship and Economic Advantage

Count III claims tortious interference with business relationships and economic advantage. Under Illinois law, the elements of such a claim are: (1) the claiming party reasonably expected to enter into a business relationship; (2) the other party was aware of the claiming party's expectation; (3) the other party purposefully prevented the claiming party's business relationship from developing; and (4) the claiming party has suffered harm as a result of the other party's interference. *Botvinick v. Rush Univ. Med. Ctr.*, 574 F.3d 414, 417 (7th Cir.

2009); *see also Maurice Sporting Goods, Inc. v. BB Holdings, Inc.*, No. 15-CV-11652, 2017 WL 2692124, at *6 (N.D. Ill. June 22, 2017). "A claim for tortious interference with business expectancy may be brought where the plaintiff has a reasonable expectation of continuing, as opposed to entering into, a business relationship." *Peco Pallet, Inc. v. Nw. Pallet Supply Co.*, No. 1:15-CV-06811, 2016 WL 5405107, at *14 (N.D. Ill. Sept. 28, 2016); *see also, e.g.*, *Dorado v. Aargus Sec. Sys., Inc.*, No. 00 C 4002, 2002 WL 230776, at *5 (N.D. Ill. Feb. 14, 2002); *see also See Redd v. Nolan*, 663 F.3d 287, 291 (7th Cir. 2011) ("a reasonable expectation of continued employment" can be the basis for a tortious-interference-in-business-relationship claim).

According to Mrs. Blake, Count III fails for two reasons. First, she argues that the Complaint suggests that she "control[led] the Company through" her husband, and thus, she could not interfere with her own business relationship as a matter of law. Second, she contends that because the Complaint describes Mr. Brodsky's business "expectancy" as one in the completion of the Modified Agreement, and because the Complaint does not plausibly allege an enforceable Modified Agreement, Mr. Brodsky cannot state a claim.

The Court disagrees on both counts. Interpreting the Complaint to plead that Mrs. Blake controlled the Auto Company as a matter of law again requires reading it in the light most favorable to her, not Mr. Brodsky. Further, while the Court agrees that Mr. Brodsky cannot premise a claim based on expectancy in the as-defined Modified Agreement (for reasons explained above), the Complaint nonetheless states a claim based on expectancy in continued employment. *See, e.g.*, *Redd v. Nolan*, 663 F.3d 287, 291 (7th Cir. 2011) ("a reasonable expectation of continued employment" can be the basis for tortious-interference claim).

In making her argument, Mrs. Blake focuses on the allegation that Mr. Brodsky and Mr. Blake expected Mr. Brodsky to remain GM "until the Completion of Tranche Two of the Modified Agreement." (R. 29 at 14 (citing R. 1 ¶ 120).) But the Complaint also alleges that Mr. Brodsky "had a reasonable expectation of continuing" as GM "so long as he was ready, willing, and able to perform." (R. 1 ¶ 122.) That "expectation" is supported by the Complaint's factual allegations. The Complaint alleges that after initial sale discussions, Mr. Brodsky began work in 2009 at the Auto Company as the GM. Mr. Brodsky continued to manage the Auto Company through 2015, even after becoming a part owner. In that role, he was responsible for a "substantial" increase in profits. Then, as explained above, Mrs. Blake helped cause Mr. Brodsky's termination without reason. Those allegations adequately state a claim for tortious interference with business expectancy in continued employment. *Accord Lonzo v. City of Chicago*, 461 F. Supp. 2d 661, 665 (N.D. Ill. 2006). The Court thus denies Mrs. Blake's motion to dismiss with respect to Count III.

## IV. Count IV Fails to State a Claim for Unauthorized Prosecution in Another's Name

Count IV claims unauthorized prosecution in the name of another. In *Safeway Ins. Co. v. Spinak*, an Illinois appellate court recognized a cause of action based on an "unauthorized filing of a lawsuit," as distinct from a claim for malicious prosecution or abuse of process. 641 N.E.2d 834, 836 (Ill. App. Ct. 1994); *see also Merriman v. Merriman*, 8 N.E.2d 64 (Ill. App. Ct. 1937). An unauthorized-filing claim "seeks redress against those who set our judicial system in motion when there is no litigant seeking to enforce a right." *Safeway*, 641 N.E.2d at 836. Thus, although *Safeway* "did not explicitly identify the elements of such a claim," another court in this district has concluded that it is sufficient to state a claim by alleging with facts that a party "filed suit on behalf of a putative plaintiff without the knowledge or consent of the putative plaintiff."

*Eul v. Transworld Sys.*, No. 15 C 7755, 2017 WL 1178537, at *21 (N.D. Ill. Mar. 30, 2017).

Mr. Brodsky argues that his unauthorized-filing claim succeeds under two theories: one, Mr. Blake did not consent to the State Lawsuit, and two, even if he did, he was not authorized to do so because he had been dissociated from the Auto Company under the Illinois Limited Liability Company Act and ousted under Paragraph 4.1 of the Ownership Control Agreement. Mrs. Blake, in contrast, argues that the Complaint does not plead Mr. Blake's non-consent to the State Lawsuit, and that the Complaint's allegations do not adequately claim that Mr. Blake automatically dissociated under the law.

Mrs. Blake has the better arguments.  First, the Complaint does not claim that Mr. Blake was not aware and did not consent to the State Lawsuit.  It, in fact, suggests the opposite.  It claims, for example, that although the State Lawsuit is "purportedly verified" by Mr. Blake, it was "*primarily* initiated and directed" by Mrs. Blake.  (R. 1 ¶ 76 (emphasis added).)  Mr. Brodsky nonetheless argues that the Complaint adequately claims that Mr. Blake did not "knowing[ly] consent [to] or authori[ze]" the State Lawsuit, in that it alleges that Mr. Blake "became mentally and physically disabled" and that Mrs. Blake then assumed "control" over him.  (R. 25 at 15.)  No matter how favorably the Court reads the Complaint, however, it cannot stretch those claims into factual allegations of sustained legal incapacity—especially when doing so would be flatly inconsistent with the Complaint's fiduciary-duty claim.

Second, the Complaint's allegations of fact do not support the conclusion that the LLC Act and the Ownership Control Agreement, as a matter of law, automatically dissociated or ousted Mr. Blake.  Under the LLC Act, a member is "disassociated" upon the "seeking, consenting to, or acquiescing in the appointment of a trustee, receiver, or liquidator of the member or all or substantially all of the member's property."  805 ILCS 180/35-45(7)(C).

Setting aside conclusory allegations, the Complaint claims that Mrs. Blake assumed her husband's work responsibilities, prohibited him from traveling alone, took his second cell phone, and controlled the use of his first phone.  Mr. Brodsky provides no explanation as to how those acts make Mrs. Blake a "trustee, receiver, or liquidator" under the LLC Act, let alone provide authority in support.  To the contrary, calling Mrs. Blake a "trustee, receiver, or liquidator" is inapt.  For one, although the LLC Act does not define those titles, they are generally associated with those who are "appointed," which Mr. Brodsky does not allege.  *See* BLACK'S LAW DICTIONARY (10th ed.) ("trustee" means "esp., one who, having legal title to property, holds it in trust for the benefit of another"; "liquidator" means "a person appointed to wind up a business's affairs"; "receiver" means a "disinterested person appointed by a court, or by a corporation or other person").  What is more, the LLC Act states that where, as here, a member "is an individual," dissociation occurs upon death, "appointment of a guardian," or "judicial determination" of incapability—none of which Mr. Brodsky has alleged occurred.  805 ILCS 180/35-45(8).  The Court thus agrees with Mrs. Blake that the Complaint does not adequately state that Mr. Blake was automatically dissociated under the LLC Act.

The Court also agrees with Mrs. Blake regarding the Ownership Control Agreement.  Under Paragraph 4.1, that agreement terminated upon the declaration of an "attending physician" that the Controlling Owner had "mental or physical disability."  Mr. Brodsky's conclusory claim that this occurred is undermined by the fact that he does not allege that he executed a "new agreement" with Kia, as Paragraph 4.1 would have required.  More importantly, Mr. Brodsky does not allege how termination of the Ownership Control Agreement would have precluded Mr. Blake from authorizing the State Lawsuit.  Instead, as the Complaint describes it, Mr. Blake and Mr. Brodsky entered into the Ownership Control Agreement not to define Mr. Blake's ownership

of company, but because Kia needed to approve Mr. Brodsky's purchase and further required

that one of the two half-owners have full and final managerial control of the dealership. Even

viewing the allegations in the light most favorable to Mr. Brodsky, the Court cannot conclude

that the Ownership Control Agreement's supposed termination precluded Mr. Blake from

authorizing the State Lawsuit. The Court, accordingly, grants Mrs. Blake's motion to dismiss as

to Count IV without prejudice.

## V. *Colorado River* **Abstention Is Appropriate**

Alternatively, Mrs. Blake requests that the Court stay this action pending resolution of

the State Lawsuit under *Colorado River*. Federal courts have a "virtually unflagging obligation"

to "exercise the jurisdiction given them." *Colorado River*, 424 U.S. at 817. "This duty to

exercise jurisdiction rests on the undisputed constitutional principle that Congress, and not the

Judiciary, defines the scope of federal jurisdiction within the constitutionally permissible

bounds." *Adkins v. VIM Recycling, Inc.*, 644 F.3d 483, 496 (7th Cir. 2011); *see also Cohens v.

Virginia*, 19 U.S. 264, 404 (1821) (federal courts "have no more right to decline the exercise of

jurisdiction which is given, than to usurp that which is not given").) That principle means that a

federal-court abstention must be "the exception, not the rule." *Ankenbrandt v. Richards*, 504 U.S.

689, 705 (1992); *see also R.C. Wegman Constr. Co. v. Admiral Ins. Co.*, 687 F.3d 362, 364 (7th

Cir. 2012) ("[A] federal district court may abstain in favor of a state court in which a parallel suit

is pending if exceptional circumstances warrant an abdication of federal jurisdiction and not

merely a delay in the proceeding in the district court").

In determining whether abstention is appropriate, "a district court must first evaluate

whether the federal and state cases are parallel." *Huon v. Johnson & Bell, Ltd.*, 657 F.3d 641,

645 (7th Cir. 2011). If the federal and state cases are parallel, a district court must then consider

whether "exceptional circumstances justif[y] abstention." *Id.* at 647. "The primary purpose of the *Colorado River* doctrine is to conserve both state and federal judicial resources and to prevent inconsistent results." *Freed v. J.P. Morgan Chase Bank, N.A.*, 756 F.3d 1013, 1018 (7th Cir. 2014).

### A. The State Lawsuit and This Lawsuit Are Parallel

"To meet the 'parallel' requirement, suits need not be identical." *Clark v. Lacy*, 376 F.3d 682, 686 (7th Cir. 2004). "Two suits are generally considered 'parallel' when substantially the same parties are contemporaneously litigating substantially the same issues in another forum." *Id.* "[F]ormal symmetry between the two actions" is unnecessary. *Lumen Const., Inc. v. Brant Const. Co.*, 780 F.2d 691, 695 (7th Cir. 1985). "Rather, there should be a substantial likelihood that the state litigation will dispose of all claims presented in the federal case." *Clark*, 376 F.3d at 686. "The court should also examine whether the cases raise the same legal allegations or arise from the same set of facts." *Freed*, 756 F.3d at 1018–19. "[A]ny doubt regarding the parallel nature of the [state court] suit should be resolved in favor of exercising jurisdiction." *Id.* (quoting *AAR Int'l, Inc. v. Nimelias Enterprises S.A.*, 250 F.3d 510, 520 (7th Cir. 2001)).

This lawsuit and the State Lawsuit are parallel. Both arise from the same set of facts—the management of the dealership, agreements for its sale, its accountings, and Mr. Brodsky's termination. Both entail the same questions—did Mr. Blake breach his fiduciary duties? was there an agreement to purchase the entire company? was Mr. Brodsky's termination wrongful?

More specifically, as to the parties: In the State Lawsuit, Mr. Brodsky has brought third-party and counter claims on his and the Companies' behalves against Mr. Blake and the Companies, respectively. In this lawsuit, he has brought claims against Mrs. Blake alone. But

"[t]he governing test is not whether the parties are *completely* the same; rather, it is whether the parties are *substantially* the same." *Restoration Servs., LLC v. R&R Boardwalk, LLC*, No. 17 C 1890, 2017 WL 5478304, at *4 (N.D. Ill. Nov. 15, 2017) (emphasis in original) (citing *Clark*, 376 F.3d at 686; *AAR Int'l*, 250 F.3d at 518). "Parties with 'nearly identical' interests are considered 'substantially the same' for *Colorado River* purposes." *Clark*, 376 F.3d at 686. Here, Mr. and Mrs. Blake have nearly identical interests as to the remaining claims. Whether Mrs. Blake tortiously induced breaches of fiduciary duties depends on Mr. Blake having breached his fiduciary duties, and whether Mrs. Blake tortiously interfered with business relationships depends on Mr. Brodsky having been terminated wrongfully.[4] The federal claims against Mrs. Blake are therefore "derivative" of the state claims against Mr. Blake, and the two have near identical interests as a result. *See Freed*, 756 F.3d at 1020–21 (7th Cir. 2014); *Freed v. Friedman*, 215 F. Supp. 3d 642, 652 (N.D. Ill. 2016) (similarity exists because where, "if [a state defendant's] version proves correct, then there were no accounting inaccuracies for which to hold [a federal defendant] accountable"); *Knight v. DJK Real Estate Grp., LLC*, No. 15 C 5960, 2016 WL 427614, at *5 (N.D. Ill. Feb. 4, 2016) (same because "Westfield's claims against Salvato in state court are derivative of its claims against Upper Midwest"); *see also Praxair, Inc. v. Slifka*, No. 98 C 7270, 1999 WL 498604, at *8 (N.D. Ill. July 7, 1999) ("Praxair's interest in this matter is directly derivative of CBI's and the two thus have identical interests in this litigation").

Further, "[t]he decision to exclude" Mrs. Blake "from the original state court proceeding

---

[4] Even as to the dismissed claims, Mr. and Mrs. Blake have near identical interests. Again, whether Mrs. Blake tortiously interfered with the contract depends on Mr. Blake having breached an agreement. The Court agrees with Mrs. Blake that her husband's success in the State Lawsuit—especially if it involves his active participation or testimony—renders Mr. Brodsky's unauthorized-filing claim less likely of success.

was entirely" Mr. Brodsky's "choice." *Freed*, 756 F.3d at 1020. Mr. Brodsky chose to file a third-party claim against Mr. Blake, but not Mrs. Blake, in state court, and then chose to bring derivative claims against Mrs. Blake in federal court. *See* 735 ILCS 5/2-406. That fact makes even less relevant any dissimilarity between the parties. *Restoration Servs.*, 2017 WL 5478304, at *4 (any dissimilarity was federal plaintiff's "making" because he chose to name a party "in the federal suit but not to name it as a third-party plaintiff in the state suit"); *Knight*, 2016 WL 427614, at *5 ("[A party] by its unilateral choice cannot destroy parallelism"); *see also Interstate Material Corp. v. City of Chicago*, 847 F.2d 1285, 1288 (7th Cir. 1988) (if the law required strict similarity, "parties could avoid the doctrine of *Colorado River* by the simple expedient of naming additional parties"). Given as much, and given Mr. and Mrs. Blake's identity of interests, the Court concludes that the parties are substantially similar.

As to the issues: In the State Lawsuit, Mr. Brodsky has, among other things, brought a claim against Mr. Blake for breach of fiduciary duties based on the events that led to his allegedly wrongful termination and a request for declaratory judgment reinstating him as GM and declaring Mr. Blake "has acted improperly." In this lawsuit, Mr. Brodsky's remaining claims allege tortious inducement of a fiduciary breach based largely on the same events and tortious interference with business relationships, specifically, his continuing employment. Thus, the "factual allegations and legal analyses in the cases largely overlap, and the issues will be resolved largely by referencing the same facts and evidence." *Freed*, 756 F.3d at 1020. That is, a "resolution in state court of two issues"—whether Mr. Blake breached his fiduciary duties and whether Mr. Brodsky's termination was wrongful—"is necessary before either of the [remaining] federal [claims] can be decided." *Id.* at 1021. The fact that the state court involves other claims is no matter; "what matters here is that the subject matter of the state counterclaims and third-

party claims is the same as the subject matter of the federal court claims." *Restoration Servs.*, 2017 WL 5478304, at \*5 (citing *Freed*, 756 F.3d at 1020)). The Court thus concludes that the issues are substantially similar.

### B. The *Colorado River* Factors Weigh In Favor of Abstention

Because the lawsuits are parallel, the Court turns to whether exceptional circumstances warranting abstention exist. Such circumstances exist "where denying a federal forum would clearly serve an important countervailing interest, such as considerations of proper constitutional adjudication, regard for federal-state relations, or wise judicial administration." *Adkins*, 644 F.3d at 496–97 (citing *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996) (internal quotation marks omitted)); *see also Huon*, 657 F.3d at 645 (explaining the *Colorado River* doctrine allows "federal courts in some exceptional cases to defer to a concurrent state-court case as a matter of wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation"). In deciding whether exceptional circumstances merit abstention, the *Colorado River* Court articulated a "flexible" ten-factor test for courts to consider. *Clark*, 376 F.3d at 688. The factors are:

> (1) whether the state has assumed jurisdiction over property;
>
> (2) the inconvenience of the federal forum;
>
> (3) the desirability of avoiding piecemeal litigation;
>
> (4) the order in which jurisdiction was obtained by the concurrent forums;
>
> (5) the source of governing law, state or federal;
>
> (6) the adequacy of state-court action to protect the federal plaintiff's rights;
>
> (7) the relative progress of state and federal proceedings;
>
> (8) the presence or absence of concurrent jurisdiction;
>
> (9) the availability of removal; and
>
> (10) the vexatious or contrived nature of the federal claim.

*Freed*, 756 F.3d at 1018.  No one factor is necessarily determinative," *id.*, and "[t]he decision to abstain is based on an assessment of the totality of the circumstances," *Finova Capital Corp. v. Ryan Helicopters U.S.A.*, Inc., 180 F.3d 896, 900 (7th Cir. 1999).

In this case, the majority of the factors weigh in favor of abstention, and some weigh heavily, "as they especially indicate that abstention would promote wise, efficient judicial administration."  *Cramblett v. Midwest Sperm Bank, LLC*, 230 F. Supp. 3d 865, 874 (N.D. Ill. 2017).  The Court, accordingly, stays this case pending resolution of the State Lawsuit.  *See Lumen*, 780 F.2d at 698.

### 1.  Whether the State has assumed jurisdiction over property

This first factor weighs against abstention.  In arguing to the contrary, Mrs. Blake asserts that her son's medical records constituted *res* over which the state court assumed jurisdiction by granting Mr. Blake's motion to quash.  The State Lawsuit is not an *in rem* action, however, and Mrs. Blake provides no law in support of her position that a court's grant of a motion to quash discovery means that the court assumes jurisdiction over the at-issue records.

### 2.  The inconvenience of the federal forum

The second factor, regarding the fora's convenience, also weighs against abstention. Here in Chicago, "[b]oth the state court and the federal court are located in downtown . . . within a few blocks of one another, leading the parties to agree that neither forum is more convenient than the other."  *Kane v. Bank of Am., Nat'l Ass'n*, No. 13 C 8053, 2017 WL 2243055, at *3 (N.D. Ill. May 23, 2017).  Mrs. Blake contends that given the convenience parity, this factor "does not weigh for or against a stay." (R. 19 at 17.)  But under *Colorado River*, "neutral factors weigh in favor of exercising jurisdiction."  *Huon*, 657 F.3d at 648.

### 3. The desirability of avoiding piecemeal litigation

This desirability to avoid piecemeal litigation strongly favors a stay. "Piecemeal litigation occurs when different tribunals consider the same issue, thereby duplicating efforts and possibly reaching different results." *Day v. Union Mines Inc.*, 862 F.2d 652, 659 (7th Cir. 1988). "Dual proceedings could involve . . . a grand waste of efforts by both the court and parties in litigating the same issues regarding the same contract in two forums at once." *Id.*; *see also Restoration Servs.*, 2017 WL 5478304, at *6.

This lawsuit involves substantially the same parties, facts, and issues "as the state counterclaims and third-party claims," and thus, "proceeding simultaneously in both forums would ensure duplicative and wasteful litigation with the potential of inconsistent resolutions of the issue." *Id.* (citing *Caminiti & Iatarola, Ltd. v. Behnke Warehousing, Inc.*, 962 F.2d 698, 701 (7th Cir. 1992)). The Seventh Circuit has made clear that "this sort of redundancy counsels in favor of a stay." *Clark*, 376 F.3d at 687. Also counseling in favor of a stay, "[s]imultaneous proceedings [ ] would encourage one or the other side to attempt to delay proceedings in one forum should the other forum appear more favorable." *Restoration Servs.*, 2017 WL 5478304, at *6 (citing *LaDuke v. Burlington N. R.R. Co.*, 879 F.2d 1556, 1560 (7th Cir. 1989)).

Mr. Brodsky argues that there is little risk of piecemeal litigation because his claims against Mrs. Blake will "remain viable" after the State Lawsuit. He does not explain how that would be if the state court decides against him and concludes that his termination was not wrongful or that Mr. Blake did not breach any fiduciary duties. Those questions are essential to his tortious-interference claims, and as such, would be in front of the Court just like they are currently in front of the state court. The risk that the lawsuits would come to inconsistent rulings on those critical issues, after duplicating work, weighs heavily in favor of a stay.

### 4. The order in which jurisdiction was obtained by the concurrent forums

This factor, too, favors a stay. The parties agree (as they must) that the State Lawsuit commenced seventeen months before this lawsuit started. The Seventh Circuit has held that far fewer months' difference leans toward a stay. *See Interstate Material*, 847 F.2d at 1289 (seven months); *Lumen*, 780 F.2d at 697 (five months). Mr. Brodsky's attempts to downplay this factor are unavailing. This is not a case involving a suit filed "the next day" or "the next month" (R. 25 at 21)—but almost a year and a half later—and the fact that Mrs. Blake is not a party to the State Lawsuit is irrelevant for these purposes.

### 5. The source of governing law, state or federal

The source-of-law factor also points toward to abstention. The Seventh Circuit has instructed that a state court's "expertise in applying its own law favors a *Colorado River* stay." *Day*, 862 F.2d at 660. Mr. Brodsky, nevertheless, argues that this factor should be given little weight because state law governs all diversity cases. But that "argument is contrary to well-established Seventh Circuit precedent, which does not assign lesser weight to this factor." *Cramblett*, 230 F. Supp. 3d at 872 (citing *Clark*, 376 F.3d at 687–88; *Freed*, 756 F.3d at 1022; *Day*, 862 F.2d at 660).

### 6. The adequacy of the state-court action to protect the federal plaintiff's rights

The next factor further tilts the balance in favor of a stay. Mr. Brodsky is an Illinois citizen already litigating substantially similar claims involving Illinois companies and an Illinois dealership in Illinois state court. There is no reason to think that the state court will not protect Mr. Brodsky's rights. Mr. Brodsky's argument to the contrary—that there was "no guaranty" that Mrs. Blake "would have consented to jurisdiction [in Illinois] since she is a resident of the State of Indiana"—is unpersuasive. He does not explain how Mrs. Blake could avoid the Illinois

long-arm statute in a suit by an Illinois resident complaining about her conduct at an Illinois dealership and her involvement in Illinois companies.  Indeed, in the State Lawsuit, Mr. Brodsky filed third-party claims based on similar facts against another Indiana resident—Mr. Blake.

In any event, "the Seventh Circuit does not equate an ability to protect the plaintiff's rights with the state court's ability to resolve all of the claims in the federal action"—rather, "it has held that, where a state court could not consider all claims raised by a federal plaintiff, that federal plaintiff's rights were nevertheless protected because it could litigate any remaining issues in federal court after the state court proceedings ended."  *Proctor & Gamble Co. v. Alberto-Culver Co.*, No. 99 C 1158, 1999 WL 319224, at *8 (N.D. Ill. Apr. 28, 1999) (citing *Caminiti*, 962 F.2d at 702).  That is the case here, as the Court will stay, rather than dismiss, this litigation.  *See Cramblett*, 230 F. Supp. 3d at 872 ("Unlike a dismissal, a stay protects a federal plaintiff's rights by allowing her the possibility to revive her federal litigation depending on the outcome in state court.").

### 7.  The relative progress of state and federal proceedings

The progress of the state proceedings weighs further on the side of a stay.  In this litigation, as in *Colorado River*, there is an "absence of any proceedings in [this court], other than the filing of the complaint, prior to" the current motion.  424 U.S. at 820.  In the State Lawsuit, conversely, the parties have engaged in discovery for over a year, have another case-management conference before the state court in less than two months, and, according to Mrs. Blake, have been court-ordered to attempt to resolve their disputes by mediation.  Mr. Brodsky's contention, that this factor "is not overly important," is unexplained, ignores the fact that "wise judicial administration" lies at the heart of abstention considerations, and has no support in Seventh Circuit law.  *See Freed*, 756 F.3d at 1023; *Knight*, 2016 WL 427614, at *7; *Bank of Am.,*

*N.A. v. Zahran*, 2011 WL 167241, at *5 (N.D. Ill. Jan. 19, 2011) (same). This factor thus favors abstention.

### 8. The presence or absence of concurrent jurisdiction

The next factor also favors abstention. Mr. Brodsky's argument that "concurrent jurisdiction does not currently exist" misunderstands the law. (R. 25 at 21.) Under *Colorado River*, concurrent jurisdiction exists when "claims in [a federal] proceeding may be brought" in state court. *Clark*, 376 F.3d at 688; *Freed*, 756 F.3d at 1023; *cf. Caminiti*, 962 F.2d at 702–03 (holding that the state court's lack of jurisdiction to hear a federal claim weighed against abstention). Mr. Brodsky's argument is all the more confusing because he admits that "concurrent jurisdiction 'exists in every diversity case.'" (R. 25 at 21 (quoting *Huon*, 657 F.3d at 648). That is true here; there appears no reason why Mr. Brodsky could not have brought his claims against Mrs. Blake when he brought substantially similar claims against her husband. Thus, this factor again weighs in favor of abstention.

### 9. The availability of removal

The availability of removal—or rather the unavailability of it—weighs in favor of abstention. *Cramblett*, 230 F. Supp. 3d at 873; *see also Clark*, 376 F.3d at 688 ("the inability to remove the New York action to federal court" weighs in favor of abstention). This factor "intends to prevent a federal court from hearing claims that are closely related to state proceedings that cannot be removed." *Freed*, 756 F.3d at 1023. The State Lawsuit cannot be removed—it involves no federal claims, it does not entail complete diversity, Mr. Brodsky is a forum defendant, the Companies are forum counterdefendants, and more than one year has passed since it started. *See* 28 U.S.C. §§ 1332, 1441, 1446. This factor too, then, supports a stay.

### 10. The vexatious or contrived nature of the federal claim

The final factor also favors a stay. As other courts have recognized, one need not "comment adversely" on a federal plaintiff's "motives to conclude that, because his federal court claims closely track his" state-court pleadings, "the federal suit is 'vexatious' and 'contrived' within the meaning of *Colorado River*." *Kane*, 2017 WL 2243055, at *5 (citing *Freed*, 756 F.3d at 1024; *Interstate Material*, 847 F.2d at 1289).

## CONCLUSION

For the foregoing reasons, the Court grants Mrs. Blake's motion to dismiss in part and dismisses Count I with prejudice and Count IV without prejudice, denies it in part as to Count II and Count III, and grants Mrs. Blake's alternative request for a stay of this case pending resolution of the State Lawsuit. The Court directs the parties to file a joint status report within 14 days of a judgment or verdict in the State Lawsuit, describing in brief the outcome of that case. In that joint status report, Plaintiff Brodsky must notify the Court as to whether it will amend its Complaint in this action. The Court will then set deadlines as appropriate.

Dated: March 2, 2018          ENTERED

 

**AMY J. ST. EVE**
**United States District Court Judge**